# EXHIBIT 6

# DEFENDANTS RESPONSE TO PLAINTIFF'S MOTION TO COMPEL

## COMBINED MULTI-LINE PROGRAM AGREEMENT
(hereinafter "this Agreement")

effective March 1, 2003,

by and among

### ACE American Insurance Company
and such other insurance companies as may be added by Addendum as parties hereto
(hereinafter , collectively, the "Company")

and

### Allied Holdings, Inc., and the subsidiaries thereof
(hereinafter the "Insured")

WHEREAS, the Insured is the Named Insured under (i) the policy(ies) of general liability, automobile liability, and/or workers' compensation insurance listed as Deductible Policies on the respective Addenda hereto (including Addenda that may be added after the effective date hereof) issued by the Company (which together with all extensions thereof and endorsements thereto, are hereinafter collectively referred to as the "Deductible Policies" or as the "General Liability Policies," "Automobile Liability Policies," and Workers' Compensation Deductible Policies," respectively), which Policies each include a Deductible Endorsement; and under (ii) the policy(ies) of insurance listed as Retrospectively Rated Policies on such Addenda hereto, issued by the Company in accordance with a Retrospective Rating Plan (which together with all extensions thereof and endorsements thereto, are hereinafter referred to as the "Retrospectively Rated Policies");

WHEREAS, the Company is willing to issue such Policies only if the Insured provides collateral security to the Company; and

WHEREAS, the Company has entered and may in the future enter into one or more contracts with the Insured's preferred claims administrator (hereinafter, the "Claims Adjusting Service") to provide claims adjusting and related services for claims arising under the Policies;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in accordance with the terms and conditions of the Policies, the Company and the Insured agree as follows:

### ARTICLE I

### INSURED'S PAYMENTS FOR DEDUCTIBLE POLICIES

The Insured agrees to pay or reimburse the Company, or the Claims Adjusting Service, if indicated in the respective Addenda, for:

a) all premiums payable to the Company under the Deductible Policies, including any audit of the Policies and recalculation of Deductible Premium as provided therein, as described in greater detail in the respective Addenda hereto;

b) Paid Loss Deposit Funds related to the Deductible Policies, as provided in Article III of this Agreement;

c) all other amounts the Insured is or may in the future be required to pay or reimburse to the Company in accordance with the terms and conditions of the Deductible Policies or this Agreement, including without limitation the Insured's share of Paid Losses and Allocated Loss Adjustment Expense;

d) Claim Administration Expense as provided in the respective Addenda hereto;

e) all amounts the Insured is or may be obligated to pay to other parties but which are paid by the Company or the Claims Adjusting Service;

and to provide collateral to the Company to secure the Insured's Obligation as provided herein.

The Company will bill the Insured monthly for Company Premium Expenses and any amounts described above in b), c) or d) which are payable or reimbursable to the Company pursuant to the Workers' Compensation Deductible Policies. The Company will also bill the Insured for any amounts described above which are payable or reimbursable to the Company pursuant to the General Liability Policies and Automobile Liability Policies if and when such payment obligations arise. Insured's payment of each such bill shall be due and payable no later than the Required Payment Date.

## INSURED'S PAYMENTS FOR RETROSPECTIVELY RATED POLICIES

The Insured agrees to pay or reimburse the Company, or the Claims Adjusting Service, if indicated in the respective Addenda, for the following amounts as they become due:

a. all amounts payable to the Company pursuant to the Retrospectively Rated Policies, including

   (i) all Company Premium Expenses payable to the Company, including any recalculation of Company Premium Expenses, as described in greater detail in the respective Addenda hereto; and

   (ii) all Paid Losses within the respective Retrospectively Rated Policies' Loss Limitations, increased by the Loss Conversion Factor (or Claims Administration Expenses) as provided in the respective Addenda hereto;

   (iii) Allocated Loss Adjustment Expense as provided in the Retrospectively Rated Policies;

b. Paid Loss Deposit Fund amounts related to the Retrospectively Rated Policies as provided in Article III of this Agreement;

c. all amounts the Insured is and may be obligated to pay to other parties under the Retrospectively Rated Policies, but which are paid by the Company;

and to secure its obligation to make such payments with collateral as provided in Article IV of this Agreement.

The Company will bill the Insured monthly for Company Premium Expenses, Paid Losses increased by the applicable Loss Conversion Factor (or Claims Administration Expenses) and Allocated Loss Adjustment Expense, and Insured's payment of each such bill shall be due and payable no later than the Required Payment Date.

## GENERAL PROVISIONS

All payments made by the Insured under this Agreement and the Policies shall be allocated first to outstanding collateral security that the Insured has failed to provide in accordance with this Agreement, then to other amounts owed to the Company other than premiums, then finally to premiums for the Policies and/or any Deductible Reimbursement Policy, regardless of the designation of the payment.

If the Insured does not pay an amount billed by the Required Payment Date:

(i) the Company shall have the right to bill the Insured for, and to collect, the Interest Charge applied to any such unpaid amount; and

(ii) the Company shall have the right to increase the required amount of any Paid Loss Deposit Fund to an amount determined by the Company, which amount may exceed the required amount as specified in Article III of this Agreement (provided, however, that this paragraph (ii) shall be applicable only in the event that the Company shall become responsible for administering the Paid Loss Deposit Fund pursuant to Article III)...

All terms and conditions of each Addendum hereto are part of this Agreement and are here incorporated by reference in their entirety.

The Insured and the Company agree that this Agreement is not intended to, and does not, amend or alter any of the terms and conditions of any of the Policies. In the event of any inconsistencies between this Agreement and any Policy, the terms and conditions of the Policy shall control.

ARTICLE II

<u>DEFINITIONS</u>

"<u>Allocated Loss Adjustment Expense</u>" shall mean such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the Company, under its accounting practices, directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses include, but are not limited to, subrogation, all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements, <u>provided</u>, <u>however</u>, that Allocated Loss Adjustment Expense shall not include the salaries and traveling expenses of the Company's employees, or the Company's overhead and adjusters' fees.

"<u>Claim Administration Expense</u>" shall mean the amounts the Company and the Claims Adjusting Service determine are needed to cover expenses of administering claims under the Deductible Policies, other than those fees related to recovery services.

"<u>Company Premium Expenses</u>" shall mean that amount the Company determines it needs to cover its expenses to administer the Insured's casualty insurance program pursuant to the Policies, including but not limited to the following:

    a.   general and administrative expense;
    b.   insurance charges;
    c.   premium taxes;
    d.   variable expenses, including but not limited to residual market assessments, boards and bureaus, non-subject state surcharges and assessments and other related fees; and
    e.   other services provided by the Company

"<u>Deductible Premium</u>" shall mean the premium after the application of the deductible credit factor, as shown on the Workers' Compensation Deductible Policies.

3

"Insured's Obligation" shall mean all amounts that the Insured is or may in the future be required to pay or reimburse to the Company or the Claims Adjusting Service, pursuant to this Agreement or the Policies, including Ultimate Losses calculated by the Company and Company Premium Expenses.

"Interest Charge" shall mean the amount of interest for which the Insured is liable to the Company, payable at the monthly rate of one and one-half percent (1.5%) (or, if such rate is impermissible under applicable law, the maximum lawful, non-usurious rate that may be charged) on any amount payable by the Insured to the Company under this Agreement, but not paid by the Insured by the Required Payment Date, said charge to commence on the day next following the Required Payment Date for any such unpaid amount.

"Paid Losses" shall mean all amounts paid for losses (exclusive of Allocated Loss Adjustment Expense) under the Policies; provided, however, that the amount payable by the Insured for each Paid Loss shall be subject to the

    i) amount of the deductible as provided in the respective Deductible Policies , or
    ii) amount of the loss limitation as provided in the respective Retrospectively Rated Policies.

"Policies" shall mean collectively, the Deductible Policies and the Retrospectively Rated Policies.

"Required Payment Date" shall mean a date not later than fifteen (15) calendar days after the date of the Company's invoice for any amount billed by the Company to the Insured under this Agreement. The Required Payment Date shall not be earlier than any due date indicated in the respective Addenda.

"Retrospective Premium" shall mean the premium computed as set forth in the retrospective premium endorsements attached to the respective Retrospectively Rated Policies.

"Ultimate Losses" shall mean losses incurred under the Policies within the respective deductibles or loss limitations plus future loss development and the amount of losses incurred but not reported, as estimated by the Company. Ultimate Losses may include Allocated Loss Adjustment Expense as estimated by the Company.

## ARTICLE III

## PAID LOSS DEPOSIT FUND

The Claims Adjusting Service, if any, indicated in the applicable Addenda will bill the Insured directly for, and will hold and adjust, the Paid Loss Deposit Fund, if any.

If for any reason the services of the Claims Adjusting Service are terminated, or if no Claims Adjusting Service is indicated in an Addendum, the Company shall assume the claim handling and claim administration services, and the Paid Loss Deposit Fund will be calculated, adjusted and held as provided below, unless otherwise indicated in the respective Addenda:

As of the effective date of this Agreement, and of each Addendum hereto, the Insured will be required to pay the Company, on or before the Required Payment Date therefor, the amount specified as "Initial Paid Loss Deposit Fund" listed in the respective Addendum. Such payments will establish and initially fund, for the Policies listed on each of the respective Addenda, a Paid Loss Deposit Fund. Each of such "Initial Paid Loss Deposit Fund" amounts shall represent the Company's estimate of the average amount the Company will pay under such Policies listed on the respective Addenda during a seventy-five (75) day period for the amount of the Insured's share of (a) Paid Losses (b) Allocated Loss Adjustment Expense, (c) amounts collectible for Loss Conversion Factors under the Retrospectively Rated Policies and (d) Claim Administration Expense.

4

In the event of any single payment of a large Paid Loss and/or Allocated Loss Adjustment Expense under any such Policy in an amount equal to or greater than the amount specified as "Single Payment of Paid Loss and/or Allocated Loss Expense" on the Addendum on which such Policy is listed, the Company shall have the right to require the Insured to pay immediately the amount of such single payment into the Paid Loss Deposit Fund.

The Company may from time to time recalculate the required amount of any Paid Loss Deposit Fund, based upon the Company's revised estimate of the average of the amounts it will pay as described above, and require the Insured to adjust the amount of such paid Loss Deposit Fund accordingly, provided, that the minimum required amount of each Paid Loss Deposit Fund shall be $1,000.

**ARTICLE IV**

## SECURITY FOR INSURED'S OBLIGATION

As security for payment of the Insured's Obligation under this Agreement, the Insured will provide to the Company, as beneficiary thereof, a clean irrevocable evergreen letter of credit (hereinafter, "LOC") issued by a bank or other financial institution, and in an amount and form, acceptable to the Company; and/or such other forms of collateral as the Insured and the Company may agree in writing from time to time.

The Insured will continue to provide the Company with a LOC (and/or other collateral) as security for payment of the Insured's Obligation, until the Company determines that there is no longer any need for such security. If there shall be a material deterioration in the financial condition of the bank or other financial institution which has issued the LOC, the Company shall have the right to require the Insured to replace the LOC with a new LOC issued by a bank or other financial institution then acceptable to the Company.

The Company shall have the right to draw against the LOC and/or other collateral in each instance where the Insured's Obligation, or any portion thereof, for any reason is not fulfilled.

Not less than thirty days prior to any termination or expiration of the LOC, the Insured will deliver to the Company a replacement LOC in an amount and form acceptable to the Company, issued by a bank or other financial institution acceptable to the Company.

Annually, the Company shall review and redetermine the amount of the Insured's Obligation and the amount of collateral security required pursuant to this article. At such time, the Insured will provide audited financial statements, interim financial statements, and any other financial information requested by the Company for the purpose of evaluating the financial condition of the Insured. The Insured will provide any needed increases in the amount of the LOC (and/or other collateral if acceptable to the Company) within thirty days of the Company's request for any additional required amount of the LOC. The Company will effect any decreases in the amount of the LOC (and/or other collateral) promptly, provided that the Insured is not in breach of any of its obligations under this Agreement or any of the Policies.

If the Insured fails to provide the Company with a replacement LOC or to provide the Company with any additional required amount of the LOC (and/or other collateral if acceptable to the Company), the Company will have the right to draw the full amount of the existing LOC and/or other collateral. The Insured recognizes that the Company may continue to require collateral as security for the payment of the Insured's Obligation after any cancellation, non-renewal, conversion or replacement of the Policies.

5

The Insured agrees that the Company shall have no obligation to remit to the Insured or to apply in reduction of the Insured's Obligation any increase or profits (including without limitation any interest or money) received by the Company from the proceeds of any LOC or from any other collateral provided by the Insured.

The Insured and the Company agree that nothing in this Agreement will constitute or be construed as a waiver of any rights the Company may have in each instance in which the Insured's Obligation for any reason is not fulfilled.

If permitted by the Company in writing, the Insured may provide all or a portion of the collateral relating to one or more of the Policies subject to a specific Addendum by purchasing an insurance policy (a "Deductible Reimbursement Policy") from an insurer approved in advance by the Company in writing.  The Deductible Reimbursement Policy shall pay the Company, on the Insured's behalf, for the Paid Losses and Allocated Loss Expenses within the Deductible Limits of the Referenced Policies.  The amount of premium, limits, terms and conditions of such Deductible Reimbursement Policy must be approved in advance by the Company in writing.

The failure or refusal by any party to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no verbal communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by the party against whom such waiver is asserted.

**ARTICLE V**

### TERMINATION/CANCELLATION OF THE POLICIES

Cancellation of any Policy by either the Insured or the Company will not terminate this Agreement.  The parties' rights, duties and obligations under this Agreement will continue after any cancellation, non-renewal or replacement of the Policies.

This Agreement shall remain in full force and effect until the parties mutually agree in writing that it shall terminate.

### CONVERSION OF RETROSPECTIVELY RATED POLICIES/TERM OF THIS AGREEMENT

For Policies shown as Retrospectively Rated on any Addendum hereto, the Company and the Insured have agreed to use incurred losses, as calculated by the Company in accordance with its standard practices, to adjust the premiums and have agreed that the Company shall bill the Insured and adjust premiums based on Paid Losses for the number of annual premium adjustments as shown in the Addendum.  Incurred losses shall be used for subsequent annual premium adjustments.

This Agreement will terminate when the Company notifies the Insured that the Insured's obligations have been discharged; or by written mutual agreement of the Insured and the Company.

**ARTICLE VI**

### GENERAL PROVISIONS/ARBITRATION

1. <u>Applicable Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania  without regard to conflict of laws principles or the application of the laws of

any other jurisdiction. No amendments or modification of this Agreement shall have any force or effect unless in writing and signed by the parties hereto.

2. <u>Successors and Assigns</u>. All the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, whether so expressed or not; <u>provided, however,</u> that no party hereto shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other parties hereto.

3. <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

4. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

5. <u>Arbitration</u>. Any controversy, dispute, claim or question arising out of or relating to this Agreement, including without limitation its interpretation, performance or non-performance by any party, or any breach thereof (hereinafter, collectively, "Controversy") shall be referred to and resolved exclusively by three arbitrators through private, confidential arbitration conducted in Philadelphia, PA, or a jurisdiction mutually agreed upon. Such arbitrators shall be disinterested, neutral individuals who have experience and qualifications in the subject matter of the Controversy. One arbitrator shall be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may choose a total of two arbitrators who shall choose the third. If the arbitrators fail to select the third arbitrator within ten (10) days after both have been named, each arbitrator shall name three candidates, of whom the other shall decline two, and the decision shall be made by drawing lots. In the event of the death, disability or incapacity of any arbitrator, a replacement shall be named pursuant to the process, which resulted in the selection of the arbitrator to be replaced. The arbitrators may abstain from following the strict rules of law, and shall make their decision with regard to the custom and usage of insurance business as at the effective date of this Agreement. The majority decision of the panel shall be final and binding upon the parties to this Agreement. Judgment may be entered upon the award of the arbitrators in any court of competent jurisdiction. Except as otherwise specifically provided in this Article, the arbitration of any Controversy shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

<u>6.</u>     Notices, etc. Unless otherwise provided in this Agreement, all notices, directions, requests, demands, acknowledgments and other communications required or permitted to be given or made under the terms hereof made for any reason other than those addressed in Article IV, shall be in writing and shall be deemed to have been duly given or made

   a.   (i) when made or given by telecopier or electronic transmission where the receipt thereof is confirmed immediately thereafter by the recipient, (ii) when received when sent, all charges prepaid, by an internationally recognized overnight courier, or (iii) when mailed through the U.S. postal service, and

   b.   when sent to the Company at the address indicated in the signatory below or in the applicable Addendum to the attention of the Underwriting Manager and/or

   c.   when sent to the Insured at the address indicated in the applicable Policy.

Each Party may from time to time designate a different address for notices, directions, requests, demands, acknowledgments and other communications by giving written notice of such change to the other Parties.

7.    Entire Agreement - this Agreement (and any written Addenda or Amendments hereto) constitutes the entire agreement between the parties and supersedes all prior agreements or understandings, whether oral or written, relating to the subject matter hereof.


IN WITNESS WHEREOF, this Combined Multi-Line Program Agreement has been executed by the parties hereto, to be effective on the date first written above.



ALLIED HOLDINGS, INC.                              ACE AMERICAN INSURANCE COMPANY

Name: _N̄ā Terwilleg-_                             Name: _Kimberly J Read_

Title: _ATTORNEY - IN - FACT_                       Title: _SVP - ARM Branch Manager_

Date: _August 13, 2003_                             Date: _8/13/03_



8

<u>2003</u> ADDENDUM TO

COMBINED MULTI-LINE  PROGRAM AGREEMENT
(this "Addendum")

for:  Allied Holdings, Inc.

Effective as of:  March 1, 2003 to January 1, 2004

The terms and conditions stated in this <u>2003</u> Addendum apply only to the Policies listed below.  All other terms and conditions of the Agreement are hereby incorporated by reference in their entirety.

Policy Listing

| DEDUCTIBLE POLICIES | | | |
|---|---|---|---|
| Policy Number | Policy Period | Deductible Limit | Issuing Company |
| WLR C4 35 15 51 2 | 03/01/03-01/01/04 | $1,150,000 | ACE American Insurance Co. |
| WLR C4 35 15 59 7 | 03/01/03-01/01/04 | $1,150,000 | ACE American Insurance Co. |
| HDO G2 17 39 20 0 | 03/01/03-01/01/04 | $500,000 | ACE American Insurance Co. |
| HDO G2 17 39 40 6 | 03/01/03-01/01/04 | $500,000 | ACE American Insurance Co. |
| ISA HO 79 34 48 8 | 03/01/03-01/01/04 | $2,000,000 | ACE American Insurance Co. |
| ISA HO 79 34 31 2 | 03/01/03-01/01/04 | $2,000,000 | ACE American Insurance Co. |

| RETROSPECTIVELY RATED POLICIES | | | |
|---|---|---|---|
| Policy Number | Policy Period | Loss Limitation | Issuing Company |
| SCFC43515639 | 03/01/03-01/01/04 | $1,150,000 | ACE American Insurance Co. |
| SCFC43515470 | 03/01/03-01/01/04 | $1,150,000 | ACE American Insurance Co. |

1. Company Premium Expenses:  Commencing on the effective date of this Addendum, the Insured will make two monthly payments to the Company by the Required Payment Date related to the above listed policies.

   a)  For the Workers' Compensation Deductible Policies, the first such payment shall be $<u>697,921</u> and the second payment shall be $<u>697,921</u>
       Effective dates 03/01/03 and 04/01/03 respectively, with **payment due on March 15 and April 15, 2003, respectively.**
   b)  For the Workers' Compensation Retrospectively Rated Policies, payments are included under the Workers' Compensation Deductible Policies.

   c)  For the General Liability Deductible Policies, the first payment shall be $<u>146.045</u> and the second payment shall be $<u>146.045</u>
       Effective dates 03/01/03 and 04/01/03 respectively, with **payment due on March 15 and April 15, 2003, respectively.**

CMULTPA
4/20/98                                         1

d) For the Auto Liability Deductible Policies, the first payment shall be $59,100 and the second payment shall be $59,100
Effective dates 03/01/03 and 04/01/03 respectively, with **payment due on March 15 and April 15, 2003, respectively.**

2. **Recalculation of Company Premium Expenses:** At the time of audit, the Company will recalculate and the Insured will pay Company Premium Expenses related to the policies above as follows:

a) For the Workers' Compensation Deductible Policies: $1,478,598, minimum and deposit, to be adjusted at the time of the audit adjustment based on a rate of $0.8679 per $100 of payroll, estimated at $170,373,812.

b) For the Workers' Compensation Retrospectively Rated Policies: Included under the Workers' Compensation Deductible Policies.

c) For the General Liability Deductible Policies: $292,089, minimum and deposit, to be adjusted at the time of audit adjustment based on a rate of $1.5016 per 1,000 "calculated mile," estimated at 194,513,010.

d) For the Auto Liability Deductible Policies: $118,200, minimum and deposit, to be adjusted at the time of audit adjustment based on a rate of $0.6077 per 1,000 "calculated mile," estimated at 194,513,010.

## ALLOCATED LOSS ADJUSTMENT EXPENSE:

The Insured shall pay or reimburse the Company for the Insured's pro-rata share of Allocated Loss Adjustment Expense (ALAE), which shall be apportioned between the Insured and the Company as follows:

a. If the total amount of a Paid Loss exceeds the amount of the applicable Policy's Deductible Limit, all Allocated Loss Adjustment Expense related thereto shall be payable by the Insured and the Company in the same proportion as their respective pro-rata shares of such Paid Loss.

b. If the total amount of a Paid Loss does not exceed the amount of the applicable Policy's Deductible Limit, all Allocated Loss Adjustment Expense related thereto shall be payable by the Insured

c. If Allocated Loss Adjustment Expense is incurred by the Company in connection with a claim under the Policies, but no payment indemnifying the claimant (s) is made with respect to such claim, all Allocated Loss Adjustment Expense related to such claim shall be payable by the Insured.

## CLAIM ADMINISTRATION EXPENSE:

The Company will engage USI of Georgia, Inc. (the "Claims Adjusting Service") to investigate, adjust, settle and provide for the defense of claims in all states arising under the Policies listed on this Addendum. The Insured and the Claims Adjusting Service will separately contract to effectuate recovery dollars for any appropriate claim.

All Paid Losses, Allocated Loss Adjustment Expense and Claim Administration Expense (other than the Claim Supervision Fee ) are payable by the Insured with respect to Policies listed above. They will be

CMULTPA
4/20/98                                    2

billed to the Insured by the Claims Adjusting Service acting on the Company's behalf, in accordance with the terms and conditions of this Agreement until written notice to the contrary is provided by the Company. The Insured agrees to pay such amounts to the Claims Adjusting Service in accordance with the terms of this Agreement, and the Company hereby acknowledges and represents to the Insured that the Claims Adjusting Service is duly authorized to collect such amounts on the Company's behalf.

The amount of the Initial Claim Handling Fee will be computed based upon the estimate of the numbers and types of claims, and the fees per claim, as set forth in the Claims Adjusting Service's fee schedules. After expiration of the policies, a claim count reconciliation will be performed by the Claims Adjusting Service. The actual numbers and types of claimants as determined by such audit[s] will be multiplied by the rates set forth in the Claims Adjusting Service's fee schedules, and the result shall be the actual total Claim Handling Fee payable by the Insured as of the date of applicable audit(s).

If the actual Claim Handling Fee determined pursuant to such claim count reconciliation exceeds the amount of the Initial Claim Handling Fee paid to the Claims Adjusting Service, the Insured will pay the difference to the Claims Adjusting Service; if less, the Claims Adjusting Service Company will promptly return to the Insured the difference between the Initial Claim Handing Fee paid to the Claims Adjusting Service and the actual Claim Handling Fee; provided, that the Claims Adjusting Service shall in any event be entitled to retain the amount of the Minimum Fee.

Should the services of the Claims Adjusting Service be terminated, and should the Company take over the handling of claims under the Policies, then the Company shall bill the Insured for the above-indicated amounts.

PAID LOSS DEPOSIT FUND:

For the Policies listed on this Addendum, the following amounts are payable as provided in Article III:

| | |
|---|---|
| Initial Paid Loss Deposit Fund: | $ 0 |
| Single Payment of Paid Loss and/or ALAE: | $ 0 |

Should USI of Georgia no longer be the Claims Adjusting Service, and should the Company commence handling claims under the Policies, the Company may require a Paid Loss Deposit Fund, as described in Article III of the Agreement.

COLLATERAL FOR POLICIES SUBJECT TO THIS ADDENDUM

As collateral to secure payment of the Insured's Obligation pursuant to the Policies listed in this Addendum, the Insured may purchase, from an insurer approved by the Company, a Deductible Reimbursement Policy at limits of insurance, and subject to premium amounts and adjustment, and other terms and conditions, acceptable to the Company.

Should the premium for the Deductible Reimbursement Policies, or any portion thereof, be unpaid, any payments made by the Insured in connection with this Agreement shall be allocated first to such premium, before allocation to the premium or Company Premuim Expenses for the Policies.

Nothing herein is intended to supercede or conflict with any of the terms and conditions of Article IV, and all of the terms and conditions of such Article IV apply.

CMULTPA
4/20/98

IN WITNESS WHEREOF, this 2003 Addendum to Combined Multi-Line Program Agreement dated March 1, 2003, has been executed by the parties hereto, each of which intends by its execution hereof to be legally bound by the terms of this Addendum and of the Agreement.

ALLIED HOLDINGS, INC.                    ACE AMERICAN INSURANCE COMPANY

Name: _I G Terwilligi_                    Name: _Kimberly Reed_

Title: _ATTORNEY-IN-FACT_                 Title: _SVP - ARM Branch Manager_

Date: _August 13, 2003_                   Date: _8/13/03_

CMULTPA
4/20/98                          4